J-A18022-15
J-A18023-15

2015 PA Super 247

| | |
|---|---|
| MARK ELY | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| SUSQUEHANNA AQUACULTURES, INC. AND DAVID ISOLANO | |
| Appellees | Nos. 2024 MDA 2014, AND 2025 MDA 2014 |

Appeal from the Judgments Entered November 24, 2014
In the Court of Common Pleas of York County
Civil Division at No: 2012-SU-1670-88

| | |
|---|---|
| MARK ELY | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SUSQUEHANNA AQUACULTURES, INC. AND DAVID ISOLANO | |
| Appellants | No 2108 MDA 2014 |

Appeal from the Judgments Entered November 24, 2014
In the Court of Common Pleas of York County
Civil Division at No: 2012-SU-1670-88

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, J., and MUSMANNO, J.

OPINION BY STABILE, J.:                    **FILED NOVEMBER 25, 2015**

Mark Ely ("Ely"), Susquehanna Aquacultures, Inc. ("SAI"), and David

Isolano ("Isolano") have filed appeals from the November 24, 2014

judgments entered in favor of Ely and against SAI for $39,600 and in favor

of Ely and against both SAI and Isolano for $24,412.34. We affirm in part, vacate in part, and remand.

The record reveals that Ely signed a two-year employment contract with SAI effective from March 2, 2011 to March 2, 2013. Isolano, the president of SAI,[1] negotiated the contract on behalf of SAI. Ely agreed to serve as SAI's vice president. SAI terminated Ely's employment on April 2, 2012 and paid him no further wages or benefits.

Ely commenced this action on April 18, 2012. In his June 10, 2013 third amended complaint he alleged causes of action for breach of contract and violation of the Wage Payment and Collection Law ("WPCL"), 42 P.S. § 260.1 *et seq.* Ely sought to recover $79,539.83 in lost wages and fringe benefits. The trial court conducted a jury trial on the breach of contract action beginning on January 13 and concluding on January 15 of 2014. The jury found SAI in breach of the employment contract and returned a verdict in Ely's favor for $39,600.00 in lost wages. By the parties' agreement, the trial court conducted a hearing on Ely's WPCL claim on February 10, 2014. On July 25, 2014, the trial court awarded Ely $24,142.00 in attorneys' fees pursuant to 42 P.S. § 260.9a(f). Ely filed a post-trial motion, pursuant to which the trial court granted Ely $270.34 in costs but otherwise denied

---

[1] Isolano became president of SAI after a group of investors purchased SAI on March 1, 2011. N.T. Trial, 1/13-15/14, at 290-91.

relief. Both parties filed timely appeals, which we have consolidated for review.

We will begin with a review of Ely's appeal at docket numbers 2024 MDA 2014 and 2025 MDA 2014. Ely raises nine issues for our review:

> A. Whether the trial court erred in not granting judgment notwithstanding the jury's verdict on [Ely's] breach of contract claim?
>
> B. Whether the trial court erred in not granting a new trial on damages because the jury's verdict was against the weight of the evidence produced at trial?
>
> C. Whether the trial court erred in not granting judgment notwithstanding the verdict on the [WPCL] claim?
>
> D. Whether the trial court erred in not granting a new trial on damages based upon the [WPCL] claim?
>
> E. Whether the trial court made an error of law in not awarding liquidated damages pursuant to the [WPCL]?
>
> F. Whether the trial court made an error of law in not calculating the lodestar in determining the amount of attorneys' fees to be awarded to [Ely] based upon his [WPCL] claim?
>
> G. Whether the trial court abused its discretion in awarding only $24,142 for attorneys' fees?
>
> H. Whether the trial court erred in refusing to grant pre-judgment interest to [Ely]?
>
> I. Whether the trial court erred in awarding only $270.34 for costs and litigation?

Ely's Brief at 6-7.

Ely first argues that the trial court erred in denying his motion for judgment notwithstanding the verdict ("JNOV") on Ely's breach of contract claim. Ely argues that the jury, upon finding SAI liable for breach of

- 3 -

contract, was required to award Ely $79,539.83 in lost wages and fringe benefits rather than the lesser amount. Ely argues that a compromise verdict is inappropriate in a breach of contract case where the record clearly establishes the plaintiff's damages. Our standard of review is well settled:

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*Egan v. USI Mid-Atl., Inc.*, 92 A.3d 1, 19-20 (Pa. Super. 2014), *appeal granted*, 108 A.3d 30 (Pa. 2015).

Damages for a breach of contract should place the aggrieved party in "as nearly as possible in the same position [it] would have occupied had there been no breach." *Helpin v. Trustees of Univ. of Pennsylvania*, 10 A.3d 267, 270 (Pa. 2010). To that end, the aggrieved party may recover all damages, provided "(1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3)

- 4 -

they can be proved with reasonable certainty." *Id.* at 270. "In an employment case, the measure of damages is the wages which were to be paid less any amount actually earned or which might have been earned through the exercise of reasonable diligence in seeking other similar employment." *Delliponti v. DeAngelis*, 681 A.2d 1261, 1265 (Pa. 1996).

Ely testified that his alleged $79,539.83 in damages included $61,222.58 in lost wages and the remainder in fringe benefits. Ely testified that he would have received $73,232.50 in wages from the date of his termination through the expiration of the contract, but he procured similar work at Aqua Life, Inc., in which he holds a one-third ownership interest, and thereby mitigated his damages by $12,009.92. In sum, Ely argues that the amount of damages was "easily and precisely ascertainable" in this case. Ely's Brief at 20.

Ely disputes whether the jury's award of $39,600.00, an apparent compromise verdict, was permissible in this case.

> Compromise verdicts are verdicts where the fact-finder is in doubt as to the defendant's liability *vis-à-vis* the plaintiff's actions in a given suit but, nevertheless, returns a verdict for the plaintiff in a lesser amount than it would have if it was free from doubt. Compromise verdicts are favored in the law. Although more commonplace in negligence cases tried before juries, such verdicts are equally appropriate in contract cases tried before the bench.

*Morin v. Brassington*, 871 A.2d 844, 852-53 (Pa. Super. Ct. 2005) (citations omitted). In any event, this Court "will not disturb a verdict unless the 'injustice of the verdict should stand forth like a beacon.'" *Frank Burns,*

*Inc. v. Interdigital Commc'ns Corp.*, 704 A.2d 678, 682 (Pa. Super. 1997).

In *Morin*, the plaintiff in a breach of oral contract action alleged he worked 40 hours per week year-round for 11 years with no time off for vacation. *Morin*, 871 A.2d at 852. The trial court found the plaintiff not credible and calculated damages based on a 30-hour workweek and 48 weeks of work per year. *Id.* This Court held the verdict was proper because no records existed to prove the numbers of hours the plaintiff worked, and because the trial court was free to disbelieve the plaintiff's testimony. *Id.* at 853. In *Frank Burns, Inc.*, another breach of contract action, the trial court found that both parties engaged in blameworthy conduct. *Frank Burns, Inc.*, 704 A.2d at 681. The trial court, lacking "a clear measure of damages," fashioned a compromise verdict whereby the plaintiff received compensation for 425 hours of work rather than the 491 hours for which the plaintiff sought recovery. Noting that "[s]uch compromises in determining damages are commonplace in litigation and are looked upon with favor by the courts[,]" this Court affirmed the verdict. *Id.* at 682.

Instantly, SAI asserted various bases for terminating Ely's employment:

  (a)   Not devoting his best efforts to his position and being derelict in his duties including defects in management, oversight in implementing adequate controls;

  (b)   Failing to track and maintain accurate records of feed;

(c)     Failing to implement policies and procedures as required;

(d)     Failing and being unable to offer solutions to manage [SAI];

(e)     Borrowing property of [SAI] for another farm in which [Ely] had a financial interest without approval of [SAI] and then lying to cover up these actions;

(f)     Misappropriating [SAI] property to his own benefit;

(g)     Failing to properly manage the fish stock resulting in loss of inventory;

(h)     Exhibiting poor management skills and not placing people who were qualified in charge of various aspects of [SAI's] operations;

(i)     Improperly soliciting [SAI] employees to work on another fish farm in which [Ely] had an ownership interest while employed at [SAI];

(j)     Falsifying reports to [SAI] about the performance of his duties;

(k)     Permitting a company culture of lies, deceit and intimidation at [SAI].

SAI's Answer and New Matter to Ely's Third Amended Complaint, 7/1/13, at

¶ 9.[2]

Ely and Isolano offered competing accounts of the events leading to

Ely's termination.  For his part, Ely asserted that SAI and Isolano terminated

his employment because SAI was in financial distress not of Ely's making.  A

_____

[2]   The employment contract required Ely to perform his duties to the "reasonable satisfaction" of SAI.  Ely's Third Amended Complaint, 6/10/13, at Exhibit A, ¶ 3.  On appeal, SAI and Isolano did not challenge the finding that SAI breached the contract.

flood devastated the farm in September of 2011. *Id.* at 123-26. After the cleanup, SAI needed approximately twelve months to restock and regrow marketable fish. *Id.* As a result, SAI laid off several employees in March of 2012. *Id.* at 127. Ely testified that Isolano was unable to procure conventional financial lending to support the farm. *Id.*

Ely testified that he never learned of Isolano's concerns about Ely's performance until Isolano fired him, or in some cases until Isolano's deposition. N.T. Trial, 1/13-15/14, at 55-56, 65, 70-71, 75-76, 78-79, 92, 94, 96-102. Ely acknowledged, however, that the agreement permitted termination without notice. *Id.* at 151, 199-200. He also acknowledged mishaps that occurred under his management, including inaccuracies in the fish count and feed inventory, and several instances in which fish died due to mistakes. *Id.* at 160-71.

Ely was responsible for reporting to the United States Fish and Wildlife Commission the amounts of Chloramine-T SAI used. *Id.* at 172. Ely signed a consultant's name on the report. *Id.* at 173-76. In addition, SAI was required to make reports for its National Pollution Discharge permit concerning the pH level of water SAI discharged into the Susquehanna River. *Id.* at 176. Ely acknowledged that he reported pH levels without taking measurements. *Id.* at 177. Ely failed to replace a $25 pH pen—a device used for measuring pH levels in water—after SAI lost its pH pen in the September 2011 flood. *Id.* at 177-78.

Concerning Ely's mitigation of damages at Aqua Life, Ely testified he worked at Aqua Life for 30 hours per week after his termination from SAI. *Id.* at 189. Ely has a one-third interest in Aqua Life. *Id.* at 190.[3] He received wages from Aqua Life reported on a W-2 and ownership income reported on a K-1 form. *Id.* at 190-91. As an owner, he can deduct business losses from any taxable income. *Id.* at 190. Isolano testified that Ely told Isolano he was merely a passive investor in Aqua Life. *Id.* at 264. Ely testified that he did not earn money for his ownership interest in Aqua-Life because it was not profitable. *Id.* at 58.

Isolano testified that he bought SAI in part because it had a good team, including Ely. *Id.* at 248. Ely worked at SAI for more than twenty years before Isolano purchased it. *Id.* at 249. Isolano became unhappy with Ely's performance because Ely was unable to account for $280.00 per week in unaccounted fish feed inventory. *Id.* at 251-52. Isolano testified that lost or missing feed inventory would cost SAI roughly $15,000.00 per year at that rate. *Id.* Shortly after the September, 2011 flood, Isolano purchased locks for the feed trailer and missing feed inventory ceased to be a problem. *Id.* at 253-54. Likewise, at various times the fish inventory was 20, 30 or as much as fifty percent lower than what Isolano expected it to be.

---

[3] Brent Blauch ("Blauch") owns the other two thirds of Aqua Life. *Id.* at 214. Blauch is the former owner of SAI, and he sold it to the investment group that made Isolano the president. *Id.* Blauch testified that he negotiated the sale with Isolano. *Id.*

*Id.* 255. Isolano claimed Ely and other members of the staff blamed the loss of fish on predators, such as birds. *Id.* at 255-56. Isolano testified that thousands of fish died for lack of oxygen because the staff failed to attach extra oxygen lines to a raceway and because the staff failed to install a screen that would allow excess feed—which absorbs oxygen—to flow out of the raceway. *Id.* at 259. Isolano also testified that SAI lost a shipment of purebred striped bass due to the error of Ely or employees under his oversight. *Id.* at 271-75.

Ultimately, the jury found SAI in breach of its employment contract with Ely, and the jury found that Ely did mitigate his damages. Ely argues that SAI and Isolano did not offer evidence to contradict his $79,539.83 in alleged damages. Therefore, according to Ely, the jury was required to award that amount upon finding SAI in breach of the employment contract. Ely argues the lesser amount does not put him in the position he would have been in absent the breach, in accordance with *Helpin*. Given the state of the record, however, we cannot conclude the jury's compromise verdict constitutes an injustice that "stands forth like a beacon." *Frank Burns, Inc.*, 704 A.2d at 682. Isolano described several significant and costly mistakes that occurred at SAI under Ely's management. Possibly, the jury issued a compromise verdict based on its belief that Ely's mistakes did not warrant termination but did warrant a lesser damages award in his favor.

Compromise verdicts, as we noted above, are favored in the law. We discern no basis for disturbing the jury's verdict in this case.

Next, Ely argues the jury's inadequate damages award warranted a new trial. Here, Ely's motion for a new trial rests on his argument that the trial court committed an error of law in allowing the compromise verdict to stand. We therefore need only discern whether the trial court committed an error of law. **Egan**, 92 A.3d at 12. For the reasons we explained in connection with Ely's first argument, we discern no error of law in the trial court's decision to allow the compromise verdict to stand.

Ely's third assertion of error is that the trial court erred in denying Ely's motion for judgment notwithstanding the verdict on his WPCL claim. Ely argues he is entitled, under the WPCL, to the value of the wages and fringe benefits SAI would have paid him for the remainder of the contract term.[4]

"The WPCL was enacted to provide employees a means of enforcing payment of wages and compensation withheld by an employer." **Voracek v. Crown Castle USA Inc.**, 907 A.2d 1105, 1109 (Pa. Super. 2006), *appeal denied*, 919 A.2d 958 (Pa. 2007). "Generally, the underlying purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its

---

[4]  Ely acknowledges that any recovery under the WPCL would be offset by the amount the jury awarded him on his breach of contract claim.

contractual obligation to pay wages." *Id.* (quoting **Oberneder v. Link Computer Corp.**, 674 A.2d 720, 722 (Pa. Super. 1996). "In essence, the primary goal of the WPCL is to make whole again, employees whose wages were wrongfully withheld by their employers." *Id.* SAI and Isolano argue that the WPCL does not apply to this case because Ely's claim is for future wages rather than wages for work performed. That is, SAI and Isolano argue that the WPCL does not provide a remedy for expectation damages.

We begin by examining the statutory language. The WPCL defines wages as all earnings, fringe benefits and wage supplements. 43 P.S. § 260.2a. The WPCL defines fringe benefits or wage supplements as "all monetary employer payments to provide benefits under any employe [sic] benefit plan [. . .] as well as separation, vacation, holiday, or guaranteed pay; reimbursement for expenses; union dues withheld from the employes' pay by the employer; and **any other amount to be paid pursuant to an agreement to the employe** [sic]." *Id.* (emphasis added). Ely relies on the bolded portion of this quote to support his argument that he can recover future unearned wages because he was entitled to those wages pursuant to an agreement.

We observe several flaws in Ely's argument. First, he relies on the definition of fringe benefits and wage supplements rather than the definition of wages. Second, the bolded language provides no guidance as to whether the WPCL applies to expectation damages in the event of termination of an

employment contract. Third, Ely relies on precedent, primarily **Shaer v. Orthopaedic Surgeons of Cent. Pennsylvania, Ltd.**, 938 A.2d 457, (Pa. Super. 2007), which undercuts his argument. In **Shaer**, the plaintiff was employed pursuant to a contract that required the employer to provide the employee ninety days of salary and benefits upon notice of termination. **Id.** at 458-61. The employee filed suit under the WPCL when the employer terminated and failed to provide the ninety days' salary and benefits. The trial court rejected the employee's claim, reasoning that it was a claim for unearned wages. **Id.** at 464. This Court reversed, holding that the employee could recover the severance pay under the WPCL. "Although a number of WPCL cases are either federal, trial level, or unpublished, and, therefore, not controlling, there seems to be consensus among them that severance pay and other separation related contractual arrangements are indeed covered by the WPCL." **Id.** at 465. The Court relied on an unpublished memorandum from the Eastern District of Pennsylvania for the proposition that contractual separation pay is recoverable under the WPCL because separation pay is distinct from "**potential lost future earnings, which are not covered by the WPCL.**" **Id.** at 465 (emphasis added) (citing **Barsky v. Beasley Mezzanine Holdings**, 2004 WL 1921156 (E.D. Pa. No. 04-1303, August 30, 2004) (unpublished memorandum)). Further, the **Shaer** Court relied on the incorporation of separation pay in the statutory definition of fringe benefits and wage supplements. **Id.**

- 13 -

Based on **Shaer**, Ely argues this Court should hold that expected future earnings under an employment contract are recoverable under the WPCL because they constitute "any other amount to be paid pursuant to an agreement to the employe [sic]" pursuant to § 260.2a of the WPCL. To the contrary, **Shear** expressly distinguished contractual separation pay from expected future earnings, noting that § 260.2a expressly includes separation pay within its definition of fringe benefits.

Instantly, Ely does not seek contractual separation pay. He does not argue that his employment contract provided for separation pay. Rather, he seeks future earnings. While precedent on this issue is limited, courts have uniformly held that the WPCL does not apply to future earnings. **Shear**; **Weingrad v. Fischer & Porter Co.**, 47 Pa.D. & C.2d 244, 250 (Bucks County 1968) (holding that the WPCL did not apply to the employee's expected post-termination earnings); **Scully v. US Wats, Inc.**, 238 F.3d 497, 516 (3d Cir. 2001) ("We agree with the general proposition that the WPCL does not give rise to claims for unearned compensation."); **Barsky**; **Allende v. Winter Fruit Distributors, Inc.**, 709 F. Supp. 597, 599 (E.D.Pa. 1989) ("The WPCL applies only to back wages already earned.").

Furthermore, § 260.5 of the WPCL, tilted "Employes [sic] who are separated from payroll before paydays", provides as follows:

> **(a) Separated Employes.--Whenever an employer separates an employe from the payroll**, or whenever an employe quits or resigns his employment, **the wages or compensation earned shall become due and payable not**

- 14 -

> **later than the next regular payday of his employer** on which such wages would otherwise be due and payable. If requested by the employe, such payment shall be made by certified mail.

43 P.S. § 260.5(a). Thus, § 260.5 expressly applies to earned wages for work performed and makes no provision for unearned future wages. In short, the statutory language and the available precedent uniformly contradict Ely's argument. We therefore conclude that the WPCL does not apply to Ely's future earnings under the employment contract. Ely's recovery of future earnings is limited to his recovery of expectation damages for his successful breach of contract cause of action, and not for any claim under the WPCL.

Ely's fourth, fifth, sixth and seventh arguments on appeal all pertain to his WPCL claim. He asserts, respectively, that the trial court erred in denying his motion for a new trial on the WPCL claim; that the trial court erred in declining to award liquidated damages pursuant to the WPCL, and that the trial court made several errors in calculating its award of attorneys' fees pursuant to the WPCL. Since we have concluded that the WPCL does not apply, we need not address these arguments.

Ely's eighth assertion of error is that the trial court erred in declining to award prejudgment interest. The trial court determined that it could not award prejudgment interest because Ely failed to request prejudgment interest in his prayer for relief in his third amended complaint. Ely argues

- 15 -

that the trial court erred, and that he is entitled to prejudgment interest as of right.

The trial court in denying prejudgment interest relied on **Snyder v. Barber**, 106 A.2d 410 (Pa. 1954). In **Snyder**, the plaintiff filed an equitable action seeking to force the Commonwealth's auditor general to pay amounts he believed to be due him under legislative salary increases. **Id.** at 411. The trial court entered judgment in favor of the plaintiff without interest. **Id.** The plaintiff did not request interest on the amount due him until the trial court asked both parties to submit a final decree. **Id.** at 412. The trial court declined to award interest and the Supreme Court affirmed: "A complainant can be afforded such relief only as he is entitled to *under the allegations of the bill*. **Id.** (emphasis in original). "The order or decree of a court of chancery should conform *to the prayer in the bill*." **Id.** (emphasis in original).

The equitable principles cited in **Snyder** have no application to the instant action at law. Ely properly cites **Fernandez v. Levin**, 548 A.2d 1191, 1193 (Pa. 1988), in support of his argument. Therein, the Supreme Court cited the well-established principle that "[t]he award of interest in a contract action is a matter of right regardless of when it is demanded." **Id.** We further observe that Pennsylvania follows the Restatement (Second) of Contracts, § 354 with regard to prejudgment interest. Pursuant to § 354(1), prejudgment interest is a matter of right where the amount is ascertainable

- 16 -

from the contract. *Cresci Constr. Servs., Inc. v. Martin*, 64 A.3d 254, 260 (Pa. Super. 2013). Where the amount due and owing is not sufficiently definite, prejudgment interest is awardable at the discretion of the trial court. *Id.*

Based on the foregoing, the trial court erred in relying on *Snyder* to deny Ely's request for prejudgment interest. Regardless, SAI and Isolano argue the trial court's decision was correct, inasmuch as Ely's damages were not ascertainable from the complaint. Ely counters that the value of the unpaid remainder of his salary and fringe benefits is ascertainable, and that he is entitled to prejudgment interest as of right.

For an answer, we turn to the language of § 354:

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
>
> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Restatement (Second) of Contracts § 354 (1981).

When a plaintiff sues for breach of contract action to recover a liquidated amount and the jury enters a verdict for a lesser amount the plaintiff still is entitled to prejudgment interest on the lesser amount. In *Burkholder v. Cherry*, 607 A.2d 745 (Pa. Super. 1992), the plaintiff contractor sued the defendant homeowners for the balance due under a

construction contract. The contract price for the home was $64,185. *Id.* at 746. The contractor also alleged $3,589.19 in extra work. *Id.* The defendants paid the contractor $35,301.75. *Id.* The contractor therefore alleged a balance due of $32,472.44. *Id.* The homeowners filed a counterclaim, alleging the contractor's work was defective and incomplete. *Id.* The jury entered a verdict of $18,000 in favor of the contractor. *Id.*

The homeowners argued that the verdict was for an unliquidated sum because it was impossible to ascertain whether the jury found in their favor on a portion of their counterclaim. *Id.* at 747. This Court, after acknowledging that the law is as stated in the Restatement (Second) of Contracts §354, disagreed:

> The basis for the contractor's recovery in the instant case was the construction contract which he had with the owners. Whether the damages were based on the terms of the contract or on quantum meruit, it is clear that the owners have had the use of the contractor's money since the date on which it was due. The amount owed, moreover, was sufficiently ascertainable so that a tender could have been made. We hold, therefore, that where, as here, the claim is for work done and services rendered, the claimant is entitled to recover pre-judgment interest.

*Id.* at 748.

The rule expressed in *Burkholder* has long been the law in Pennsylvania. In *Oxford Mfg. Co., Inc. v. Cliff House Bldg. Corp.*, 307 A.2d 343 (Pa. Super. 1973), this Court wrote as follows:

> The lower court in its opinion stated that since defendant disputed plaintiff's claim because of defective items, the claimed sum, although based on contracts, was not liquidated and that

therefore interest did not accrue thereon. We disagree. In ***West Republic Mining Co[.]v. Jones & Laughlins***, 108 Pa. 55 (1884), an early but leading case, plaintiff sued to recover the price of certain ore sold and delivered to defendant, defendant refusing to pay on grounds that the ore did not conform to samples. The lower court instructed the jury that in their discretion they could allow or disallow interest. The Supreme Court of our Commonwealth held this instruction to be error and further held: 'A dispute has arisen respecting the performance of the contract by the plaintiffs, and the amount of the debt, [b]ut however determined, the debt arises from contract.'

*Id.* at 344-45. This Court both in ***Oxford*** and ***Burkholder*** emphasized that simply because a jury returns a verdict in an amount less than that prayed for does not convert an otherwise liquidated amount into an unliquidated amount upon which interest does not accrue. ***Burkholder*** 607 A.2d at 748 (citing cases); ***Oxford*** 307 A.2d at 344-45. If the rule were otherwise, a breaching party could always defeat a claim for pre-judgment interest by, for example, asserting a counterclaim. *Id.* We therefore conclude that Ely was entitled to prejudgment interest as of right on the amount of the judgment in his favor on his breach of contract action. The trial court erred in finding otherwise.

Ely's final argument is that the trial court erred in awarding only $270.34 in litigation costs representing payment for his filing fee and Sheriff's service fees. Ely believes he is entitled to $2,348.12 in costs, including items such as witness fees, copy expenses, and transcript preparation.

The trial court, citing ***Zelenak v. Mikula***, 911 A.2d 542 (Pa. Super. 2006), held that record costs—i.e. the filing fee and Sheriff's service—are recoverable, whereas actual costs such as witness fees and transcript preparation are not. The ***Zelenak*** Court wrote: "It is a general rule in our judicial system, stemming from the Statute of Gloucester, 6 Edw. 1, c. 1 (1275), that costs inherent in a law suit are awarded to and should be recoverable by the prevailing party." ***Id.*** at 544. "Important to our analysis of all of Appellant's issues is the distinction between record costs (such as filing fees) and actual costs (such as transcript costs and witness fees)." ***Id.*** "[T]he law is clear that, absent specific statutory authority otherwise, only record costs of proceedings in court are recoverable, and not costs of preparation, consultation, or fees generally[.]" ***Id.*** at 545 (quoting ***Harmer v. Horsham Hospital, Inc.***, 431 A.2d 1187, 1188 (Pa. Commw. 1981)).

Thus, the trial court correctly applied the applicable rule, and Ely does not cite any statutory authority requiring a different result in this case. Rather, he relies on ***Smith v. Rohrbaugh***, 54 A.3d 892 (Pa. Super. 2012). In ***Smith***, the prevailing party sought record and actual costs. ***Id.*** at 897-98. The trial court declined that request and asked the prevailing party to submit a request for record costs only. ***Id.*** at 898. The prevailing party failed to do so, and therefore the trial court denied all costs. ***Id.*** This Court reversed, and held the prevailing party was entitled to $339.93 in record costs, including filing fees and nominal copying fees for exhibit books the

trial court ordered the prevailing party to prepare. *Id.* The costs of exhibit books were appropriate because the trial court ordered them pursuant to a pretrial order and the parties therefore had no discretion in the matter. *Id.* This Court declined to award the prevailing party's request of more than $10,000.00 in actual costs, including expert witness fees. *Id.*

Here, the record indicates that the trial court ordered preparation of exhibit books. Amended Order Preliminary to Trial of Civil Case, 11/4/13, at 2-3. Ely represents that he incurred $675.59 in costs in preparing exhibit books. We therefore remand for a revised order of costs including the costs associated with preparation of exhibit notebooks pursuant to the court's pre-trial order.

Having disposed of all of Ely's arguments, we now consider the appeal of SAI and Isolano at docket number 2018 MDA 2014. SAI and Isolano raise three issues:

A. The trial court erred in its application of the coordinate jurisdiction rule in determining that the [WPCL] applied to this case.

B. The trial court erred in denying SAI and Isolano's motion in *limine* regarding the [WPCL] where Ely's claim was for unearned wages.

C. The trial court erred in allowing evidence of SAI's farm service agency claim where the evidence was unfairly prejudicial.

Brief of SAI and Isolano, at i. We have already concluded that the WPCL does not apply to Ely's claim for unearned wages. For this reason, we will

vacate the trial court's order awarding Ely attorneys' fees pursuant to the WPCL. We need not address issues A and B further.

The final assertion of error from SAI and Isolano is that the trial court erred in permitting Ely to introduce evidence of an allegedly inaccurate application for federal disaster relief from the Farm Service Administration ("FSA") after an unexpected heatwave killed a large number of fish at SAI. Specifically, Ely introduced evidence purporting to show that Isolano grossly overrepresented the number of fish mortalities at SAI in order to qualify for relief. Admission of evidence rests within the trial court's discretion, and we will reverse only if we find an abuse of discretion. *Klein v. Aronchick*, 85 A.3d 487, 498 (Pa. Super. 2012), *appeal denied*, 104 A.3d 5 (Pa. 2014). "Thus our standard of review is very narrow[.] To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Id.* SAI and Isolano argue that evidence regarding the disaster relief application was inadmissible because its probative value was outweighed by the danger of unfair prejudice, as per Pa.R.E. 403. "Unfair prejudice supporting exclusion of relevant evidence means a tendency to suggest decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially." *Klein*, 85 A.3d at 498. "A witness can be contradicted only on matters germane to the issue trying. There is no rule more firmly established than this: 'No contradiction shall be permitted on collateral matters.'" *Id.* at 500

(quoting **Hammel v. Christian**, 610 A.2d 979, 984 (Pa. Super. 1992), *appeal denied*, 624 A.2d 111 (Pa. 1993)).

Ely testified that SAI's FSA application indicated that SAI lost 366,868 fish as a result of the flood. N.T. Trial, 1/13-15/14, at 120. Ely testified the number was 51,707. **Id.** SAI and Isolano objected to the admission of this evidence, but the trial court found it admissible because it was relevant to support Ely's assertion that Isolano fired him because SAI was in serious financial trouble and not because Ely's performance was deficient. Trial Court Opinion, 11/17/14, at 6-8. The trial court also observed that it permitted Isolano to introduce evidence explaining the discrepancy, which Isolano did.[5]

We cannot conclude that the trial court's decision to admit this evidence warrants a new trial. SAI and Isolano rely on **Klein**, a medical malpractice suit in which the plaintiff claimed she developed kidney disease as a result of her use of a drug manufactured by the defendant. **Klein**, 85 A.3d at 489. The trial court permitted the defense to examine the plaintiff about her history of bulimia. **Id.** at 500. During a deposition, the plaintiff denied having bulimia, but the plaintiff's medical records indicated otherwise. **Id.** at 498-500. The history of bulimia, if plaintiff had such a

_____

[5] Isolano testified that Ely relied on piecemeal documentation to support his allegation that Isolano overrepresented the number of fish mortalities. N.T. Trial, 1/13-15/14, at 276-82.

history, occurred decades prior to the events giving rise to the litigation and had no bearing on the plaintiff's kidney disease. *Id.* at 498. The defense used the issue purely to challenge the plaintiff's credibility. This Court concluded that a new trial was necessary because the plaintiff's history of bulimia, or lack thereof, had nothing to do with the issues before the trial court. *Id.* at 500-01.

Instantly, unlike in *Klien*, the challenged evidence relates to the time period relevant to the litigation. This case is further distinct from *Klein* in that both parties used the FSA application issue to cast aspersions on the other side's credibility. Ely introduced documentation to support his assertion that Isolano overrepresented the number of fish mortalities. Isolano testified, consistently with his assertions of other deficiencies in record keeping under Ely's management, that Ely compiled data that was inaccurate, incomplete, and unreliable. As a matter of law, we cannot say the trial court abused its discretion in admitting the FSA evidence. Further, the accuracy of the FSA application was a small piece of a substantial body of evidence the parties placed before the jury over the course of the trial. To the extent the trial court may have erred in permitting Ely to examine Isolano on the accuracy of the FSA application, we conclude the error was harmless.

Based on all of the foregoing, we vacate the judgment of November 24, 2014 awarding $24,412.34 in attorneys' fees pursuant to the WPCL. We

affirm the judgment of $39,600.00 against SAI in all respects except for the trial court's award of costs and its refusal to award prejudgment interest. On those issues, we vacate and remand for further proceedings consistent with this opinion.

Judgment of $24,412.34 vacated. Judgment of $39,600.00 affirmed in part and vacated in part. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/25/2015